KASS HARSTAD (Bar No. 11012)
ERIKA BIRCH (Bar No.10044)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
tel: 801.359.4169
fax: 801.359.4313
kass@utahjobjustice.com
erika@idahojobjustice.com

*Attorneys for Plaintiff*

---

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| **LARAE WILLIAMS**, <br><br> Plaintiff, <br><br> vs. <br><br> **WALMART, INC.,** a Delaware corporation, <br><br> Defendant. | **COMPLAINT** <br> **AND JURY DEMAND** <br><br> Case No.  4:19-cv-00103 <br><br> Judge:  David Nuffer |

---

Plaintiff Larae Williams, ("Employee" or "Plaintiff"), by and through her attorneys, hereby complains against Defendant Walmart, Inc. ("Walmart" or "Defendant"), as follows.

### I.     PRELIMINARY STATEMENT

1.       This suit is brought by Larae Williams, a female employee of Walmart employed during and between the years of 2008 and 2010 who was subjected to gender discrimination by Defendants in violation of Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq.* ("Title VII").

2.      Plaintiff seeks all available remedies including damages, attorneys' fees, costs, and interest, and compensatory damages.

3.      Over fifteen years ago, the Dukes v. Wal-Mart class action commenced as a national class against Wal-Mart Stores, Inc., the largest retailer in the world and the largest private employer in the United States. The action alleged that female employees in Wal-Mart and Sam's Club retail stores were discriminated against based on their gender, with respect to pay and promotion to management track positions, in violation of Title VII.

4.      In 2004, the United States District Court for the Northern District of California certified a national class of female employees challenging retail store pay and management promotion policies and practices under Fed. R. Civ. P. 23(b)(2). On June 20, 2011, the United States Supreme Court reversed that class certification order, holding that the national class could not be certified based on the facts in the record.

5.      On June 24, 2011, the plaintiffs in Dukes moved to extend tolling of the statute of limitations in the Northern District of California. On August 19, 2011, the court granted plaintiffs' motion in part and extended the tolling period awarded to former class members under American Pipe and Construction Co. v. Utah, 414 U.S. 538, 554 (1974) for a limited time, and set forth the dates by which former class members had to file Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6.      All former class members who had never filed an EEOC charge had until May 25, 2012, to file charges in states with 300 day limits.

7.      In accordance with these deadlines, Ms. Williams filed a Charge of Discrimination with the EEOC on May 24, 2012 alleging sex discrimination, and she filed an Amended Charge of Discrimination on August 14, 2012.

8.     The EEOC issued Ms. Williams' individual right to sue notice on September 23, 2019, and Ms. Williams received the notice On September 26, 2019.  Ms. Williams has filed this Complaint within the 90 days.

9.     Ms. Williams has therefore exhausted her administrative remedies and complied with the statutory prerequisites of Title VII by timely filing EEOC charges of discrimination.

10.     The relevant time period in this action for Plaintiff's claims is based on the limitations period from Dukes. The limitations period starts on December 26, 1998, which is 300 days before the earliest charge filed with the EEOC by a former member of the Dukes class, and runs through the date of trial.

## II.     PARTIES

11.     At all times relevant to the Complaint, Ms. Williams resided in the State of Utah, and was employed by Walmart at Store # 1439 in Washington, Utah.

12.     Formerly, Ms. Williams was named Larae Farmer.

13.     Defendant Walmart is a massive corporation, incorporated under the laws of Delaware, operating within the State of Utah during all times relevant to this complaint.

14.     In February of 2018, Walmart changed its name from Walmart Stores, Inc. to Walmart, Inc.

## III.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Ms. Williams is bringing claims for violations of federal law.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because all of the employment practices alleged to be unlawful were committed within the jurisdiction of this Court.

## IV.    GENERAL ALLEGATIONS

**Organizational Structure and Hierarchy**

17.    In the time period relevant to this lawsuit, Walmart retail operations were divided geographically into six Walmart divisions, each consisting of approximately six regions. Each region was split into multiple districts. Approximately seven to ten stores were assigned to each district.

18.    All stores typically had the same or similar job categories, job descriptions and management hierarchy. At the bottom of the ladder, the primary entry-level hourly positions were Cashier, Sales Associate, and Stocker.

19.    The first step above an entry-level job was an hourly supervisor position, including Department Manager, Customer Service Manager and Support Manager. The next step up was Management Trainee ("MIT"), a four-to-five-month program that prepared employees to be Assistant Managers, a salaried position. Each store had several Assistant Managers. The next level was Co-Manager, a position used only in larger stores, and then Store Manager.

20.    In years prior to Ms. Williams' employment, from 1998-2004, Store Managers set pay for hourly employees following guidelines governing compensation. Each Store Manager reported to their District Manager, and in order to maintain a consistent administration of the pay guidelines, certain hourly pay decisions were reviewed by the District Manager for approval. Thus, the Store Managers received regular feedback from the District Managers about their decision making.

21.    District Managers reported to the Regional Vice President ("RVP"). In addition to the formal feedback from District Managers to Store Managers, both the RVP and District Managers spent a large amount of time touring stores and talking with the Store Managers in

those stores. Similarly, the RVP held regular in-person meetings and conference calls with all the District Managers. These regular meetings touched on many aspects of store operations, including people issues. Thus, there was a constant stream of communications with district and regional management that provided feedback to Store Managers about their hourly compensation decisions and guidance about how Walmart regional management expected them to carry out their responsibilities.

22.     The RVP also had overall responsibility for pay increases for Assistant Managers and had influence over promotions into MIT positions.

23.     Each Region also had at least one Regional Personnel Manager ("RPM"), who was responsible for promotion into the MIT program and starting pay for MIT and Assistant Managers.

**Pay Discrimination**

24.     During the years prior to Ms. Williams' employment, Walmart set compensation of store-based employees using a common set of guidelines, which Walmart's managers applied consistently. The pay guidelines established basic standards for setting pay rates at hire and subsequent pay adjustments for hourly and salaried employees.

25.     Walmart's compensation policies prior to June 2004 – including its policies of using a set of prescribed factors to set starting pay for hourly associates at a pay rate above the minimum rate, granting discretion to Store Managers to set starting pay, permitting them to evaluate and weight the prescribed factors as they chose, failing to require those Store Managers to document the reasons for setting starting pay and merit increases as they did, and setting pay adjustments based on the associate's prior pay – had an adverse impact upon its female employees.

26.     Until June 2004, the RPM, RVP, and District Managers received regular reports about compensation for hourly and salaried employees, showing that female employees were paid less than men on average. These managers therefore had knowledge of the compensation discrimination present in the stores over which they had authority.

27.     In 2004, Walmart introduced a new pay structure, in which many jobs which had previously been in one pay class were assigned to separate classes depending on department. Pay rates differed depending on the pay class in which an hourly employee worked, and therefore the department in which that hourly employee worked.

28.     The proportion of women in Walmart's departments varied greatly. Many jobs in departments in which women were over-represented were assigned to lower job classes, while those same job titles in departments over-represented by men were assigned to higher job classes. Walmart's 2004 pay restructuring had an adverse impact on its female employees.

29.     In 2005, Walmart started giving newly hired employees "credits" for prior work experience. Because each credit was worth more to employees in higher job classes, the application of this credit policy exacerbated the pay disparities and had an adverse impact on female employees.

30.     Then, in 2006, Walmart added a cap on the pay permitted for each job class, further impacting the pay of women relegated to the lower job classes, which had lower pay caps. This also had an adverse impact on female employees.

31.     Though Walmart made changes to its pay rates and pay decision-making structure, Walmart continued to discriminate against women by paying them less than their male counterparts throughout Ms. Williams' period of employment.

32.     As a result of the policies referenced above, women who held hourly positions in Store #1439 were regularly paid less than similarly-situated men, although, on average, those women had more seniority and higher performance ratings than their male counterparts.

**Promotion Discrimination**

33.     *Management Track Positions Below Assistant Manager* - Support managers are the highest level hourly supervisory positions at Walmart. Support managers assume the duties of Assistant Managers in an Assistant Manager's absence. Employees in these positions are often groomed for further advancement. The vast majority of support manager vacancies are not posted or otherwise communicated to hourly associates within the store. There has been no formal application process for selection for these positions, and no job-related criteria for selecting employees for promotion to support manager. Additionally, although it is not a true "management" position, department manager is often a necessary step for employees hoping to work their way into salaried management. Women applying for department manager positions are often subjected to severe gender stereotyping, and are rejected out of hand for most openings in "masculine" departments such as sporting goods, hardware, etc.

34.     *Promotion to Management Trainee* - Entry into the MIT Program is a requirement for advancement into Assistant Manager and other salaried management positions. Prior to 2003, there was no application process or job posting for MIT positions. Hourly employees were not provided any information regarding how to enter management, or what the requirements or qualifications were for entering management, or how to apply for the MIT Program.

35.     Walmart's established criteria for the MIT program prior to 2003 included willingness to relocate. Willingness to relocate was a factor known to deter women from

pursuing such positions and which Walmart executives acknowledged was not justified by business necessity.

36.     In January 2003, Walmart instituted a posting system for entry into the MIT Program. This system was used through 2006, and positions were posted for one week, a few times per year. This posting system required candidates to agree to certain job conditions, including (1) assignment to a store up to a one-hour drive from home; (2) travel for up to six weeks; and (3) replacing the requirement that all candidates be willing to relocate with a statement that the greater geographic area an individual would move to, the more likely they would be promoted. All three factors would be more likely to discourage women than men, in a manner similar to the prior relocation requirement. Notably, travel assignments were filled on a voluntary basis, so stating that six weeks of travel would be required was not a fair representation of the actual job requirements.

37.     Starting in 2007, Walmart began using a new system for all management promotions, including MIT. This system permitted employees to register in advance for the positions and geographic areas in which they were interested. Every vacancy was expected to be posted with a "requisition" which automatically applied the minimum qualifications Walmart required for the position to the group of those who had expressed interest in the position within that geographic area, and presented the hiring manager with a set of candidates. It was particularly common for managers to post a position, see who the candidates were, and then close the posting without selecting anyone because the manager's pre-chosen candidate was not included in the pool ("pre-selection").

38.     Both before and after Walmart posted MIT positions, the selection process involved screening by District Managers and approval of selections by the RPM. In 2003, in

addition to posting, Walmart adopted standardized interview questions, which it used through 2009.

39.     The District Managers and RPM were provided uniform guidelines setting minimum eligibility criteria for promotion into the MIT Program, including minimum tenure, age (18 years or older), absence of current "active" discipline, satisfactory recent performance evaluations, and willingness to relocate. Yet no job-related criteria were required for selecting individuals from the pool of employees who meet these minimum criteria.

40.     Employees selected into the MIT Program are required to transfer from their stores and often their districts as they enter training and Assistant Manager positions, subject to very limited exceptions that must be approved by the RPM and RVP.

41.     Despite the changes to the MIT promotion process, two things remained consistent barriers to women: (a) a refusal to post or a system to circumvent the purpose of posting to choose a preferred candidate identified prior to posting ("pre-selection"); and (b) requiring candidates to be willing to relocate, or to accept comparable conditions on travel and commuting distance. These policies had a disparate impact on female candidates.

42.     Management-track promotional policies and practices have denied interested and qualified women equal access to promotional opportunities because such opportunities are not posted, there is not an open application system, and employees are not informed of the criteria for promotion. Moreover, managers do not require or use valid, job-related factors in making the promotion selections within the Region. Nor does Walmart specify the weight that should be accorded any requirements for promotion. As a consequence, qualified women have been denied equal access to promotions because of their gender.

43.     Managers have not documented, and Walmart has not tracked, the reasons for selecting particular employees for promotion into management. Managers have not documented, and Walmart has not tracked, which employees have been denied consideration for promotion because of their inability to comply with these relocation, travel, and scheduling requirements.

44.     Walmart's policies, including its failure to require managers to base promotion decisions for individual employees on job-related criteria, its refusal to post job openings, and the conditions placed on applicants for the MIT program that they be willing to relocate, have had an adverse impact upon its female employees.

45.     *Promotion to Co-Manager* - The RVP, with input from RPM and District Mangers, selects Co-Managers. The majority of Co-Manager promotions are transfers across district lines. Co-Manager openings were rarely posted and there was no formal application process for such positions during many of the relevant years.  While there have been minimal eligibility requirements for promotion to Co-Manager, such as satisfactory performance and willingness to relocate, there are no job-related criteria for making selections among those who meet the minimum criteria or for determining which store to assign to a Co-Manager.

46.     Females have also been far less likely than their male counterparts to receive promotion to management track positions, including support manager, MIT and Assistant Manager, Co-Manager, and Store Manager positions, despite the fact that they have had equal or better qualifications than male counterparts who have been promoted.

47.     Female employees must also wait significantly longer to be promoted into management track positions than men with equal or lesser qualifications.

48.     Walmart management has long known about gender disparities in promotion and has failed to take appropriate remedial action. Walmart management thus had knowledge of the promotion discrimination present in the stores over which it had oversight.

49.     Every store, District and Region regularly compiles and reports to corporate headquarters the gender composition of its hourly and managerial workforce, employee turnover, exceptions to promotion policies, job posting data, entry into MIT programs, and other data. District Managers, the RPM, and the RVP regularly receive these reports.

50.     Walmart's People Division regularly prepares reports for senior management summarizing promotion and incumbency rates for store management positions by gender, and reports are regularly made to the Board of Directors.

51.     District Managers, the RPM, and the RVP normally visit stores regularly and are aware of the gender composition of the workforce.

52.     Senior management officials, senior People Division officials, and outside consultants have warned Walmart that women are not sufficiently represented in management positions, that women are paid less than male employees in the same jobs, and that Walmart lags behind its competitors in the promotion of women to management positions.

53.     These officials and consultants have also identified policies and practices at Walmart that have an adverse impact on its female employees, including lack of consistent job posting, the requirement of relocation as a condition of entry into and promotion through management, reliance on stereotypes in making pay and promotion decisions, lack of objective criteria for making promotion decisions, and lack of consistent and reliable scheduling for management level employees.

54.    Walmart's founder, Sam Walton, conceded in 1992 that Walmart's policies, particularly its relocation requirement, were an unnecessary barrier to female advancement, yet this policy remained in place thereafter.

55.    Senior Walmart managers also blocked policy changes that would have reduced the impact of Walmart's discriminatory policies, including posting of managerial vacancies.

56.    Walmart had never studied or analyzed whether any of its practices were consistent with business necessity or whether less discriminatory alternatives to these policies and practices could be adopted.

**Walmart Managers' Reliance on Discriminatory Stereotypes**

57.    In the absence of job-related compensation criteria, Walmart's managers in Store Number 1439, and those supervising Store Number 1439, relied on discriminatory stereotypes and biased views about women in making pay and promotion decisions.

58.    A 1998 survey of Walmart managers revealed that there was a "good ol' boy philosophy" at Walmart, that many managers were "close minded" about diversity in the workplace, and that some District Managers "don't seem personally comfortable with women in leadership roles."

59.    The findings of the 1998 survey echoed an earlier 1992 report by a group of female Walmart management employees, who identified a number of concerns for women employees, including the following: "Stereotypes limit the opportunities offered to women," "[c]areer decisions are made for associates based on gender," "[a]ggressive women intimidate men," "men are interviewed as the replacements, women are viewed as support," and "[m]en's informal network overlooks women."

60.    All Walmart Store Managers have been required to attend training programs at the company's Walton Institute. These managers were advised at the Institute that the reason there are few senior female managers at Walmart is because men were "more aggressive in achieving those levels of responsibility" than women. Managers were cautioned that efforts to promote women could lead to the selection of less-qualified women over more-qualified men.

61.    On or about January 24, 2004, at a meeting of all Walmart District Managers presided over by Walmart's CEO Thomas Coughlin, the District Managers were told that they were the key to running the stores: "You are the culture." The key to success was described as "single focus to get the job done. . . . Women tend to be better at information processing. Men are better at focus single objective. Results driven." The District Managers were instructed to create a "culture of execution" and a "culture of results" as they picked "[f]uture leaders."

62.    In deciding which employees to promote as department managers — hourly positions which were often stepping stones into salaried management — Store Managers in Store Number 1439 would often consider women only for "female" departments, such as health and beauty, jewelry, softlines, and the service desk.

63.    Managers in Store Number 1439, and managers who supervised that store, justified denying promotions to women or paying them less than their male employees because of perceived family obligations of the women and male responsibility to support their families or because of their presumed inability to relocate.

**Walmart's Ineffective Anti-Discrimination Efforts**

64.    For many years, Walmart had no meaningful policies or practices to hold managers in, or managers supervising, Store Number 1439 accountable, financially or otherwise, to equal employment and diversity policies and goals.

65. Starting in 2000, Walmart asked District Managers to set diversity "goals" for advancement of women in management. The goals were based on each manager's individual views on what was attainable and were not tied to any objective measures of availability or qualifications. Prior to 2004, failure to meet diversity goals had no financial or other consequence for managers in, or managers supervising, Store Number 1439.

66. As late as 2003, Walmart CEO Coughlin was not aware of any diversity goals or whether managers had met such goals. Many Store Managers were also unaware of the existence of any diversity goals.

67. Until at least 2003, there had never been any diversity goals set for individual stores, or for any compensation practices in Store Number 1439.

**Ms. Williams' Employment at Walmart**

68. Ms. Williams began working as a Cashier at Walmart Store Number 1439 in Washington, Utah in April of 2008.

69. Ms. Williams observed female employees, herself included, gettin paid less than male employees with equal or less tenure and experience.

70. Ms. Williams' starting wage was $8.60 per hour.

71. When she left Walmart in April of 2010, her pay was still only $9.70 per hour.

72. Men that were working in the same position as Ms. Williams with less experience, were getting paid more than her.

73. Ms. Williams also observed Walmart give more promotional opportunities to male employees than to female employees.

74. When Ms. Williams was hired, she spoke with multiple managers and expressed her desire to enter management.

75.     Ms. Williams recalls speaking about this topic with her store manager, Kurt.

76.     Kurt told Ms. Williams to take the computer-based management tests.

77.     Ms. Williams took all of the tests available to her, she passed them all and received good scores.

78.     Once she completed the tests she reached out to Kurt again seeking a management position.

79.     Ms. Williams did not receive a promotion. Instead, Ms. Williams watched as the men around her received the promotions she was qualified for.

80.     Ms. Williams recalls a man named Jason who was promoted from Cashier to management, even though he had less time and less experience at Walmart than Ms. Williams.

## FIRST CLAIM FOR RELIEF
### (Pay Discrimination in Violation Title VII)

81.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

82.     Over a time period spanning many years, including the time Ms. Williams worked at Walmart, the company acted with deliberate indifference toward its obligation to make job wage decisions without regard to gender.

83.     Walmart repeatedly chose to pay males more than females because of their gender.

84.     Walmart refused to pay Ms. Williams in accordance with her male counterparts.

85.     Walmart discriminated against Ms. Williams on the basis of gender and treated her differently than a male employee.

86.     As a result of the Walmart's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, Ms. Williams is entitled to entitled

to damages, including lost wages; compensatory damages; emotional distress damages; prejudgment interest; and attorneys' fees and costs expended in this action.

87.     Walmart's unlawful conduct toward Ms. Williams was done with reckless disregard for her federally protected rights, and as such, Walmart should be subject to punitive damages as well.

## SECOND CLAIM FOR RELIEF
### (Promotion Discrimination in Violation of Title VII)

88.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

89.     Walmart is an extremely large employer with hundreds of employees in each store and thousands of employees within the State of Utah.

90.     Over a time period spanning many years, including the time Ms. Williams worked at Walmart, the company acted with deliberate indifference toward its obligation to make employment promotion decisions without regard to gender.

91.     Walmart refused to promote Ms. Williams into a permanent position, instead promoting a male employee with far less experience and lesser relevant credentials.

92.     Walmart discriminated against Ms. Williams on the basis of gender and treated her differently than a male employee.

93.     As a result of the Walmart's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, Ms. Williams is entitled to entitled to damages, including lost wages; compensatory damages; emotional distress damages; prejudgment interest; and attorneys' fees and costs expended in this action.

94.     Walmart's unlawful conduct toward Ms. Williams was done with reckless disregard for her federally protected rights, and as such, Walmart should be subject to punitive damages as well.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award the following relief:

a. For Plaintiff's lost wages, compensation, and benefits;

b. For compensatory damages;

c. For general damages including emotional distress;

d. For punitive damages;

e. For Plaintiff's reasonable attorneys' fees, including expert witness fees as provided by 42 U.S.C. §1988 and 42 U.S.C. §2000e-5;

f. For pre-judgment and post-judgment interest at the highest lawful rate;

g. For costs of court and such other relief as the court deems just and equitable,

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 19th day of December, 2019.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Kass Harstad
Attorneys for Plaintiff